Thank you, Your Honor. May it please the Court, my name is Katherine Hart, and I am the attorney for Appellant Xi Andy Lieng. This case presents the application of the Court Interpreters Act to a case where my client, after trial and during the course of his sentencing, told the Court that he did not understand a lot of the sentencing report and requested an attorney. The judge, Judge O'Neill at that time, said to Mr. Lieng, well, there was nothing that you didn't understand at trial. I don't buy that. There was not one instance in which you did not understand. You understood every question. The issue here is whether it had been brought to the Court's attention at any point that my client needed an interpreter, because under the C case that is cited in my brief, and that's a pretty important case which I think is dispositive here, United States v. C, 333 F. 3rd, 1041, 9th Circuit, 2003. Under that case, the Court has an independent obligation to inquire as to the defendant's need for an interpreter if there is any notice that the defendant needs an interpreter. So where in the trial, not the sentencing, where in the trial do you think that the Court should have engaged in this inquiry? Well, I think it's pretty obvious at the very beginning, before the testimony is taken in the trial, when there's a true name finding, Reporters' Transcript 6, where the judge says, I need to know your true name, your legal name. And he says, last name Lieng, middle name A, and first name called Xi, X-I. And the Court says, all right, where does Andy come in? Is that the middle name? Defendant says, yes, yes, because when they hard to read Xi, we just reach to A as Andy. Now, that, I don't know about to you, but that to me is very difficult to understand. It's extremely non-idiomatic English. We don't know what he means. Because when they hard to read Xi, who was it who found it hard to read Xi? The next, perhaps the next motion. You don't know? You don't have a clue as to who he was talking about? Well, when he's talking about, when he's talking about, because when they hard to read Xi, we just reach to A as Andy, I assume he's saying that, that Americans had difficulty pronouncing the word Xi or understanding the word Xi. And it's true that in Chinese, it is, I can agree that it is probably somewhat difficult to pronounce, because the Chinese Xi can be pronounced either a G or a Xi. It's a sound we, it's difficult for us. But then he says, we just reach to A as Andy. Well, that doesn't really explain why. He comes from Vietnam, right? He had to come through Customs and Immigration, all right? In New York, we have lots of people who have gotten their name from an immigration, from an immigration officer in the same way. It's a very common, common, you know, something that happens. Yes. I understood exactly who he meant. I'm surprised you didn't. Well, no. I understand that. I'm quite sure the judge understood exactly who he meant, too. Well, but when somebody says when they hard to reach Xi, we just reach to A as Andy, my point is that although you might understand, as in going through Ellis Island, that somebody's given a name, and indeed, if you have traveled to Southeast Asia, you have found that a lot of individuals who speak Chinese and Vietnamese adopt an American name, an American-sounding name in kindergarten, and they become Sally or Betty or Linda or something. They do adopt an American name. Well, the difficulty in this case. That's true, but that shows that he is a foreigner. Oh, excuse me. But we have a lot of folks in similar positions. The question is, did they understand what's going on? And Judge O'Neill participated with the trial, testified for two days, didn't ever request an interpreter. His lawyer says when this comes up, I asked him if he wanted an interpreter. He said no. And then finally at sentencing, he said, well, I'm not sure I understand everything. I just, in looking through this, I find it hard to pinpoint the precise time that this independent duty on the court should have been triggered. Well, if it wasn't triggered at the beginning. Because if everybody, it shows a little bit of difficulty with the language. If that's, if that requires a colloquy independent of any request, that's a pretty large burden on the district court. Well, I think a close examination of the C case discloses that there is a duty of the court to inquire whenever there is an issue of somebody whose predominant language may be other than English. And if it wasn't apparent at the very beginning of the trial, it certainly became apparent later on. And I don't think, I don't think I cited this quotation in my brief, but on page 664 of the transcript, when the defense counsel is asked how long is the defense case going to take. And, of course, the defense case was entirely my client's testimony. That was, that was the grovelment of the defense case. So the court asks how long is the defense case going to take. And Mr. Panzer, the counsel of record, says, I will have Mr. Ling on the stand for quite a while, I believe. Judge O'Neill says, what's your definition of quite a while? Mr. Panzer says, it's hard to say because of the language issue, but I can't say. Now, this is a case where co-defendants, many co-defendants, several co-defendants have been represented by counsel who had asked for an interpreter. In this case, my client's common-law naturalized wife, Jenny Chiha, she used a Cantonese interpreter, and yet there was testimony at trial that she spoke very good English, and also my client's brother, Tony Ling, he used a Cantonese interpreter, and then there were other co-defendants who used a Vietnamese interpreter. So one could argue, one could argue that because interpreters were used, my client knew that there were interpreters available. Yes, but one can also argue that because there were interpreters that were called for in this case, that the court then should have undertaken a specific inquiry as to why Mr. Ling did not want an interpreter. And the C case in which the defense counsel had told the court and discussed with the court whether they needed an interpreter and said, oh, well, one will be standing by in case we're needed, you sent that case back, even though the defense counsel in the C case more strongly than in this case did say, well, we did discuss with the court the need for an interpreter. Defense counsel here did not bring to the court's attention the need for an interpreter. I agree with that. The defense counsel didn't say we need an interpreter, but the court, based on other if not at that point, at the point where defense counsel says, well, this could take some time because of the language issue. And then right after that, when my client is first called to testify and he is asked about his education, well, what he says about his education is, I got very minimum of education. I do some of middle school and some high school. Well, I don't want to quibble about idiomatic English because I don't think that's a standard, but I do some of middle school and some high school. That would signify, notify the court that here is a defendant who is about to take the stand, who is about to undergo extensive cross-examination after his testimony, who is going to be asked about complex issues, and he says, I do some of middle school and some high school. That and counsel's notification that this could take some time because of the language issue squarely puts in front of the court a duty to inquire that you see in the C case. You're down to about a minute 17. Do you want to reserve? Yes, thank you. Good morning, Your Honors. Karen Escobar on behalf of the United States. I handled the case in the district court as well. May it please the Court, at no time did the defendant ever request an interpreter during the trial of this case, and as you're aware from the record, the only time he requested an interpreter was at sentencing, and the court continued the matter for sentencing when the court was made aware that he needed an interpreter. After his attorney advised the court that his client did not fully understand the presentence report, which is somewhat technical, the guidelines are somewhat technical, the defendant indicated he understood most of the presentence report. The court obliged and allowed time for the defendant to confer and to review the presentence report with his attorney and an interpreter, and then a Cantonese interpreter was present at the sentencing. Throughout the proceedings, the defendant was given many opportunities to have an interpreter. Before the trial, the court issued an order asking the parties whether anyone needed an interpreter. The defendant never, ever indicated he needed one. He indicated that he might call his partner or wife, Jenny Ha, as a witness at trial, and she might need an interpreter. At trial, Mr. Panzer, who represented the defendant, indicated that he might call Ms. Ha as a witness and even advised the court we would need additional time to obtain the services of the interpreter and would need a brief continuance during the trial. The defense never did call Ms. Ha as a witness, but the defendant was fully aware  The defendant communicated with the court and his four attorneys, he had four different attorneys during this case in the district court, in English. There was never any, ever any indication that he did not understand the proceedings, that he did not comprehend what was going on. He did not exhibit any inability to communicate. Now, during the trial, there might have been some stumbling or difficulty in communicating but the jury was able to understand, the court was able to understand. There were other witnesses at trial who indicated they did not understand what was going on. As the government indicated in its brief, trials are a stressful situation. There was, at one point, the government's chemist who was testifying to the fact that the substance that was seized from these grow houses was marijuana. She said, I don't understand your question. There were stumblings by other witnesses. So it was not unusual that the defendant might have inartfully explained how he obtained the name of Andy. The government, even at one point prior to trial during the proceedings before the magistrate, when the Cantonese interpreter was present for some of the co-defendants and a Vietnamese interpreter present for Monique Nguyen, who was the mortgage fraud broker in this case that was used to acquire the homes that were purchased for the marijuana cultivation operation, one of the interpreters asked me, did anyone else need an interpreter? And I placed on the record the fact, Your Honor, this was before the magistrate judge, that interpreters are asking if anyone else needs an interpreter. Mr. Ling did not need an interpreter. So the court never abused its discretion in not finding that the defendant needed an interpreter during the trial. The defendant was provided an interpreter when he indicated he did not understand the pre-sentence report. You know, there's a pretty – C contains some pretty broad language. It says that whenever the court's put on notice that there's a potential language difficulty, then the court ought to engage in a colloquy. So how do you – how do you interpret C in this context? Well, C was factually different, because during that case, there was – there were other languages that were used during the trial. And the – this court – Why does that make a difference? Well, the court cannot intuit there is a language problem if there was no objective evidence to so suggest. In the C case, this court indicated that the trial court was well aware of the defendant's language difficulties during the trial. There was no objective evidence at the trial of Mr. Ling that he did not understand what was transpiring or that he was unable to communicate. He chose to speak in a language that he had been speaking for the 33 years that he'd been in this country. Both as a businessman. He'd worked in Silicon Valley, was the president of an electronics company. He had a successful produce business in Fresno, distributed fruit throughout California. There was no indication that he did not understand the English language. So C was – C is factually distinguishable, Your Honor. Would you address the leadership enhancement, please? Yes. I just don't see a lot of evidence at trial that he was, in fact, leading anybody. I see that he was a major participant. But we don't have any factual findings by the district court. Would you address that, please? The court did not make specific findings. We believe that the Petrie case that this court issued back in April of this year is dispositive. And I believe this court found that there is no need to – for the district court to amplify its findings to provide specific findings where there have been no specific objections by the defense. Here the defense objections, which were late, were not based on specific factual objections. They were based on the fact that they disagreed with the leadership enhancement. What evidence in the record supports independently imposition of the leadership enhancement? There were documents presented at trial indicating that the defendant – well, was basically the puppet master for the acquisition of both the villa and the Donner house. He directed his wife or partner, Jenny Ha, to acquire the properties. He was in communication with Monique Nguyen when he was looking for the homes. And then there are documents presented at trial showing that the escrow company faxed to him documents to have Jenny Ha sign. He directed the signing. He directed Jenny Ha to acquire the homes in her name. He benefited. He obtained a check for the landscaping at Donner. That document was submitted at trial as well. The evidence indicated that he orchestrated and directed then his wife to obtain the properties to sign documents. And so the leadership role is supported by that. The fact that there were more than five people involved, there were his brothers, one of the wives of the brothers, all involved, Monique Nguyen, Shirley Wong, one of the property buyers that the defendant and his wife once lived with here in the Bay Area. The enterprise involved at least five participants, was extensive, and therefore there was evidence to show that he exercised independent decision-making and control over his wife, and that supported the enhancement. What's our standard of review on that issue? Clearly erroneous, Your Honor. However, we are, we submit that the objection was waived because the defense did not submit the informal objections to the pre-probation officer. If there is no objection, there still has to be evidence to support the enhancement. Yes. And we believe that that evidence was presented at trial, which the district court saw, and that does support the district court's finding that the enhancement applies, as the probation officer found in the pre-submission. It's a conclusion. He didn't make any factual findings. He did not make any specific factual findings. That is true, Your Honor. And we do believe that the Petrie case supports the district judge's failure not to make those findings because there were no specific factual objections. But he adopted the PSR. Correct. And then the other issue, the Rule 33, it is our position. Again, that was late. It was, that's jurisdictional. And the evidence that he attempted to submit was impeaching, and the district court submitted. Based upon our briefs, we would submit, Your Honor, unless you have any further questions. Thank you very much. Thank you very much. With regard to the interpreter, if you look and scour the record, you can see indications from the very beginning that my client was having problems with the language at his original arraignment when he was represented by the Federal Defender's Office, and he was told that if at the end of the representation he was found that he would be able to afford to pay fees, he may have to pay those fees, and he was asked directly, do you understand? And there was no audible response to that. Two years before the trial, when Judge O'Neill was questioning him, Judge O'Neill was trying to determine whether other people might have paid, third parties might have paid the legal fees, and he asked Mr. Ling if somebody else had paid the legal fees.  So there were indications before trial and then, as I've said, during the trial. Now, as far as requesting from counsel notification about an interpreter, there is a docket, number 284, a minute order. It was an order to defense counsel to let the court know whether an interpreter would be needed for a witness. That notice to defense counsel had to do with whether an interpreter would be needed for Jenny Chiha, the common-law wife of my client, who needed a Cantonese interpreter. But that directive did not affect the need for an interpreter in general in the trial, just whether an interpreter was needed for a witness. And I submit that the case law here in this circuit is clear that when the court's notice that the court has an independent duty, whether the attorney has notified the court, whether the defendant has notified the court or not, the court has an independent duty to inquire and make an evaluation about whether an interpreter is needed. And in this case, it really affected the presentation of my client's testimony. And the Court Interpreters Act goes not to just whether it inhibits the comprehension of the proceeding, but one prong of that Court Interpreters Act also talks about whether it affects the presentation of testimony and the as well as the comprehension of the proceedings. And in this case, my client's testimony and presentation was affected by the lack of an interpreter. Thank you, counsel. Your time has expired. Oh, all right. Yeah. Thank you. The case just heard will be submitted for decision.
judges: Duffy, Thomas, Rawlinson